IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| A.D.D., : <br> : <br> **Plaintiff,** : <br> : <br> v. : <br> : <br> KILOLO KIJAKAZI, : <br> **Acting Commissioner of Social Security,** : <br> : <br> **Defendant.** : <br> : | No. 5:22-cv-241 (CHW) <br><br> Social Security Appeal |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff A.D.D.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. The Commissioner's decision is based on the application of proper legal standards and is supported by substantial evidence. Accordingly, the Commissioner's decision is **AFFIRMED**.

## BACKGROUND

Plaintiff filed an application for a period of disability, disability insurance benefits, and Supplemental Security Income on May 5, 2020. (R. 204-14). Plaintiff alleged disability beginning on August 28, 2017, and his last insured date expired on June 30, 2020. (R. 215). Plaintiff's application was denied initially on June 22, 2020, and upon reconsideration on September 21, 2020. (R. 116-20, 128-32). Plaintiff requested a hearing by an Administrative Law Judge (ALJ), which was held by video conference on June 15, 2021. (R. 49-73). The ALJ issued a decision

determining that Plaintiff was not disabled on August 26, 2021. (R. 8-21). Plaintiff requested review from the Appeals Council, which was denied on April 27, 2022. (R. 1-7). Plaintiff timely appealed the decision on June 30, 2022. (Doc. 1).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment,

whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

On March 25, 2010, Plaintiff underwent a right lower extremity venous duplex study which showed small amount of residual thrombus in his superficial femoral vein at Southern Regional Hospital. (R. 348). This evaluation was consistent with previous thrombus noted in 2007. (*Id.*) The report noted that there was no apparent active thrombus at the time and that his deep and superficial venous system otherwise appeared to be normal. (*Id.*) Plaintiff was evaluated for swelling and pain in his right leg that had been ongoing for two weeks on July 14, 2010. (R. 386). The evaluation described Plaintiff as noncompliant with his prescribed medication, Coumadin, and as struggling with polysubstance abuse of tobacco and alcohol. (*Id.*) Plaintiff denied any shortness of breath, dizziness, or cough. (*Id.*) Plaintiff received a Doppler ultrasound of his right lower extremity that showed acute deep venous thrombosis involving multiple deep veins. (*Id.*)

Plaintiff presented at Athens Regional Medical Center on March 26, 2011, for pain and swelling in his right leg. (R. 441). Plaintiff acknowledged that he was supposed to be taking Coumadin, but he was out of his prescription. (*Id.*) Plaintiff was alert, appropriate, cooperative, and oriented, with a regular and strong peripheral pulse. (*Id.*) Plaintiff was experiencing non-pitting edema in his right ankle, and a noninvasive evaluation of his right lower extremity revealed evidence of chronic deep vein thrombosis extending from the common femoral artery through the superficial femoral and popliteal veins. (*Id.*, R. 450). Additionally, chronic phlebitis was found

in the greater saphenous vein. (R. 451). Plaintiff was also experiencing abdominal pain related to his gallbladder, which was removed on March 29, 2011. (R. 469).

Plaintiff was treated at St. Mary's Health Care System from June 1, 2012, to June 7, 2012, following a seizure that he experienced while driving his car. (R. 531). This seizure resulted in a vehicular accident, which left Plaintiff with a small left frontal contusion, a small subdural hematoma, mild atrophy with subdural hygroma, a small left-sided subdural hematoma, and subarachnoid hemorrhage. (*Id.*) Plaintiff had elevated liver function studies related to alcohol abuse and experienced delirium tremens that required medical treatment. (*Id.*) Plaintiff's previously present thrombophlebitis was examined in the right leg, but treatment was not recommended because it was an old condition and because Plaintiff had previously been noncompliant with medication for the condition. (*Id.*) The seizure Plaintiff experienced while driving was determined to be a grand mal seizure with undetermined etiology. (*Id.*) Plaintiff's seizure was indicated as possibly related to his alcohol use, and the records note a history of seizure eight to ten years prior which had been attributed to alcohol use. (R. 534, 535).

Plaintiff returned to St. Mary's Health Care System on November 12, 2012, following another seizure. (R. 663). At that time, it was undetermined how much of his condition was related to alcohol consumption, although given the amount he was consuming daily, the medical provider "[was] sure [his alcohol consumption] [was] playing into his symptoms." (*Id.*) Plaintiff was reported to be noncompliant with follow-up for any of his previous treatment. (*Id.*) Plaintiff's deep vein thrombosis in his lower right extremity was examined again, and no treatment was recommended as it remained unchanged. (*Id.*) Plaintiff was prescribed Dilantin for his seizures. (*Id.*) Plaintiff returned to St. Mary's again on November 18, 2012, reporting that he had experienced a seizure at church. (R. 665).

On November 23, 2016, Plaintiff was examined at Omni Health Solutions after complaining of swelling, edema, and poor circulation. (R. 1327). Plaintiff reported having experienced these issues for the past three months, and his symptoms were deemed moderate and specifically occurring in the right ankle. (*Id.*) No other associated symptoms were noted. (*Id.*) Plaintiff denied any recent drastic changes in energy levels, chest pain or palpitations, and abdominal pain. (R. 1328). Plaintiff's respiration was noted as normal and regular, but rhonchi were noted on the auscultation over lungs, as well as coarse, scattered wheezing, upper airway noises, and poor air movement. (*Id.*) Examination of Plaintiff's lower extremities revealed abnormalities such as numbness and tingling and dry, ashy skin with black spots from small vessel disease. (R. 1329). Plaintiff's femoral pulse was abnormal, and his dorsal pedis pulses were diminished. (*Id.*)

Plaintiff was examined at Coliseum Northside Hospital on August 15, 2017, and given a CT scan of his abdomen and pelvis. (R. 1325). The scan found mild left basilar consolidation, diffuse fatty infiltration of the liver, and coarse calcifications within the head of the pancreas which may have been related to previous pancreatitis. (*Id.*)

Plaintiff arrived at Medical Center Navicent Health on January 4, 2019, by ambulance following a seizure. (R. 877). Plaintiff was postictal when emergency services arrived at his home, and he was tachycardic and hypertensive upon arrival at the hospital. (*Id.*) Plaintiff reported that he had previously taken medication for his seizures, but his doctor had discontinued the medication years ago. (*Id.*) Plaintiff was prescribed Phenytoin and instructed to have a follow up visit at Anderson Health Center. (R. 889).

Plaintiff returned to Medical Center Navicent Health on April 29, 2019, reporting left foot and ankle swelling after dancing with his mother the night before. (R. 920). Plaintiff's foot and

ankle were swollen and warm to the touch. (*Id.*) Upon examination, a fracture was found in Plaintiff's left foot. (R. 971). Plaintiff was instructed to maintain the short leg stint provided and to elevate and ice his foot as much as he could tolerate to treat the swelling and pain. (R. 935).

On July 24, 2019, Plaintiff returned to the Medical Center Navicent Health by ambulance and reported that he had experienced two seizures by himself at home and another after the fire department went to his house. (R. 994). Emergency services reported that Plaintiff was "okay with them." (*Id.*) Plaintiff's blood pressure was elevated upon arrival at the hospital, but he stabilized before discharge the next day. (*Id.*, R. 995). Plaintiff was again prescribed Phenytoin. (R. 1021).

Plaintiff returned to the Medical Center Navicent Health on July 8, 2020, after having another seizure that his family witnessed. (R. 1112). Plaintiff experienced confusion as a postictal symptom. (*Id.*) Plaintiff's missing his medication was identified as the exacerbating factor behind the seizure, and alcohol abuse was identified as a risk factor. (*Id.*) Plaintiff reported that he had been off his seizure medication for several months because he could not tolerate Dilantin, and he drank about every other day. (*Id.*) Plaintiff was willing to begin medication again and was prescribed Keppra. (*Id.*)

On May 18, 2021, Plaintiff visited First Choice Primary Care to establish care there. (R. 1303). Plaintiff reported dizziness while rising from a sitting position and chronic headaches. (*Id.*) Plaintiff also reported that he had previously had a head injury that left him in a coma, bedridden for eight months, with short term memory issues. (*Id.*) Plaintiff denied any change to his mental status, seizures, sleep problems, tremors, or weakness. (*Id.*) However, Plaintiff did report experiencing depression, as well as crying at home, and he cried in the medical office during his visit. (*Id.*) Plaintiff denied taking medication for his symptoms, seeking counseling, or seeing a

psychiatrist previously. (*Id.*) Family stability, his responsibilities taking care of his mother, getting along with his brother, and financial issues were all reported as stressors related to his mental health, but Plaintiff's mood was classified as stable. (*Id.*) Plaintiff reported little interest in doing things, feeling down or hopeless nearly every day, trouble falling or staying asleep, sleeping too much, feeling tired and having little energy as symptoms during his depression screening. (*Id.*)

*Hearing Testimony*

Plaintiff testified at his hearing before the ALJ that he was 58 years old, divorced, and lived with his mother. (R. 54-55). Plaintiff completed high school and almost a year of college. (R. 55). He reported problems with writing or typing because of tremors in his hands, as well as vision problems and headaches that interfered with his ability to read. (*Id.*)

Plaintiff previously worked at Reco USA as a customer service representative who handled inbound and outbound phone calls and did computer research. (R. 56). Plaintiff previously lifted twenty to twenty-five pounds occasionally in the course of this work. (R. 57). Plaintiff admitted to previously using marijuana and overusing alcohol. (*Id.*) Plaintiff reported that he had reduced his alcohol consumption to "one beer or two beers per week." (*Id.*) Plaintiff explained that he never gets eight hours of sleep per night and instead sleeps two or three hours per night in thirty-minute increments. (*Id.*) Plaintiff uses a walker to help him shower, eats microwaved food for convenience, occasionally washes small loads of laundry, takes out the trash and washes the dishes about once a week to help his mother, and seldom shops for groceries, with the use of a motorized cart. (R. 58). Plaintiff reported listening to music, reading, and meditation as hobbies. (*Id.*)

Plaintiff described his conditions as including poor circulation, three broken tendons in his left foot, deep vein thrombosis in his right foot, and swollen ankles. (R. 59). Plaintiff had last had

a seizure the day before the hearing and reported that he has as many as three seizures per day, with no less than two daily. (*Id.*) Plaintiff's seizures begin with tremors in his hands and chest, sometimes in his abdomen as well. (R. 59-60). Plaintiff loses the ability to speak as his mouth begins to twitch, he begins to sweat profusely, and he feels as though his eyes cross and he cannot see very well. (R. 60). Plaintiff's seizures last five to nine minutes and require him to lie down and relax. (*Id.*) Plaintiff reported that he had not had a grand mal seizure since July 10, 2020, because of his medication, Keppra. (*Id.*) Plaintiff's blood pressure remained elevated, but his blood cell counts were normal. (*Id.*) Plaintiff experienced nightmares as a result of his medication, as well as anxiety and anger for no apparent reason. (R. 61). Plaintiff also experienced headaches, dizziness, and weakness as side effects. (*Id.*)

Plaintiff described his depression as extreme and explained that he cried without knowing why. (*Id.*) Plaintiff denied taking any medication for his depression, however, and reported that he was only taking Keppra and baby aspirin at the time of the hearing. (*Id.*) At the time of the hearing, Plaintiff had met with a psychiatrist during the prior week and had two more psychiatric sessions scheduled. (*Id.*) Plaintiff attributed his delay in treatment to his lack of health insurance and difficulty in paying for his treatment, which he said family and friends helped him afford. (R. 62). Plaintiff reported that he found it difficult to be around others and that small noises, such as a telephone ringing, could make him suddenly angry. (*Id.*) Plaintiff also reported that his headaches made it difficult for him to concentrate and that he would "become a recluse" and needed to be alone when he experienced headaches. (R. 63). Plaintiff estimated that he needed to be away from people at least four days a week. (*Id.*)

Plaintiff testified that he did not believe his seizures were a result of his alcohol consumption, as he continued to have seizures even after reducing his alcohol consumption. (R.

8

64).  Plaintiff described difficulties in his prior work as a customer service representative related to his poor circulation, as he could not remain at his desk for more than an hour or two without standing.  (R. 65).  Plaintiff could not sit for more than an hour at the most without being uncomfortable, and then needed to stand for at least ten minutes before sitting again.  (R. 65). Plaintiff reported consistent swelling in his right foot, which required him to elevate the limb for about thirty minutes at a time and to sleep with it elevated for as long as he could tolerate it.  (R. 65-66).  Plaintiff sometimes could not urinate as a result of his medication, sometimes experienced problems breathing, and required a hemorrhoidectomy.  (R. 67).

## DISABILITY DETERMINATION

Following the five-step evaluation process, the reviewing ALJ made the following findings.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 13).  At step two, the ALJ found that Plaintiff has the following severe impairments: seizure disorder, left calcaneal fracture, peripheral neuropathy, and hypertension.  (*Id.*)  The ALJ found that Plaintiff's depression, deep vein thrombosis, left occipital neuritis, atherosclerosis of native arteries with intermittent claudication, arterial stenosis, lower extremity edema, history of pancreatitis, history of cholecystitis, fatty liver disease, lung bibasilar atelectasis, hemorrhoids, thrombocytopenia, tobacco use disorder, alcohol dependence, history of marijuana abuse, and ketonuria were non-severe medically determinable impairments.  (R. 14). At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (R. 15.)  Before evaluating Plaintiff at step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff had the RFC to perform medium work as defined in 20 CFR § 416.967(b), with the following exceptions: he is limited to

lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; he could frequently climb ramps or stairs, frequently balance, stoop, kneel, crouch, or crawl; he could occasionally climb ladders; and he must avoid all exposure to hazards such as unprotected heights and dangerous moving mechanical parts. (R. 15-16). At step four, with the benefit of a Vocational Expert, the ALJ found that Plaintiff could perform relevant past work as a customer service representative. (R. 19). Accordingly, the ALJ found that Plaintiff was not disabled. (R. 20).

## ANALYSIS

Plaintiff argues that remand is appropriate because (1) the ALJ erred when assessing Plaintiff's RFC, and (2) the ALJ's rejection of Plaintiff's testimony is unsupported by substantial evidence. The record does not support these arguments and shows that the ALJ applied the correct legal standards and that the decision supported by substantial evidence.

1. *The ALJ did not err when assessing Plaintiff's RFC*

Plaintiff argues that he provided positive objective evidence of his depression, the pain and swelling in his lower extremities, and residuals of longtime seizures, neuritis, and headaches. (Doc. 15 at 6). Plaintiff contends that the ALJ "selected the medical evidence that best fit her decision and rejected all other findings." (*Id.*) Additionally, Plaintiff argues that the ALJ failed to discuss Plaintiff's mental RFC and improperly assessed his depression. Finally, Plaintiff points to his own testimony and the fact that his family helped him get treatment for his conditions as evidence that the ALJ erred in weighing his lack of treatment against him. (*Id.*)

While it is true that an ALJ's decision is improper if it is reached because the ALJ "focus[ed] upon one aspect of evidence and ignoring other parts of the record," review of the record in this case shows that the ALJ considered the evidence as a whole when making her

10

decision and assessing the Plaintiff's RFC.  *McCruter v. Bowen*, 791 F.2d. 1544, 1548 (11th Cir. 1986).

When the claimant has alleged that several impairments render him disabled, the ALJ must consider a claimant's impairments in combination to determine whether combined impairments support a finding of disability.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002).  The ALJ met that requirement in this case, as she listed Plaintiff's alleged impairments and stated that she considered the impairments singly and in combination with each other.  (R. 14).  This language is more than sufficient to meet the requirement of considering the combined effect of Plaintiff's alleged impairments.  *See Hamby v. Soc. Sec. Admin., Comm'r.*, 480 F.App'x. 548, 550 (11th Cir. 2012) (holding that this requirement is met "if the ALJ states that the claimant 'did not have an impairment or combination of impairments' that would amount to a disability") (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th. Cir. 2002)).  The ALJ found that Plaintiff "does not have an impairment of combination of impairments" that meet or medically equal a listing. (*Id.*)  Nevertheless, the ALJ "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's [RFC]."  (R. 14).

Although Plaintiff argues that the ALJ improperly assessed Plaintiff's depression and failed to discuss his mental RFC, the ALJ's decision shows that the ALJ properly considered Plaintiff's symptoms and subjective complaints related to his mental health conditions in making her decision.  Specifically, the ALJ noted that Plaintiff's "medical record shows limited mental health treatment, as [Plaintiff] reported he was stable in his family life and he maintained the ability to be a caretaker for his mother."  (R. 14).

In making her findings regarding Plaintiff's mental health conditions, the ALJ analyzed Plaintiff's symptoms according to the four broad functional areas of mental functioning: (1)

11

understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (*Id.*) The ALJ found that Plaintiff had mild limitation in understanding, remembering, or applying information, as he maintained the ability to count change, use money orders, handle a savings account, and pay bills. (*Id.*) The ALJ also noted that Plaintiff was able to remember to take his medications, although he occasionally needed reminders to do so. (*Id.*) The ALJ found that Plaintiff had mild limitation in interacting with others, as he maintained the ability to spend time with others, including talking on the computer and spending time with his family. (*Id.*) Plaintiff reported that he gets along with authority figures and that he had never been laid off as a result of issues interacting with others. (*Id.*) The ALJ determined that Plaintiff also had mild limitation in the third functional category, concentrating, persisting, or maintaining pace. (*Id.*) Plaintiff reported that he could maintain his attention for up to eight hours, and the ALJ determined that he was able to finish things as he starts them and follow written and spoken instructions well. (*Id.*) In the final functional area, adapting or managing himself, the ALJ found that he had mild limitation, as the record showed he maintained the ability to care for himself and his mother, but he occasionally needs assistance showering because of his physical limitations. (R. 15). The ALJ noted that Plaintiff maintained the ability to prepare simple meals, clean, and maintain his finances when making that finding. (*Id.*).

      The ALJ fully considered the extent to which Plaintiff was limited by his mental health conditions and whether they should be considered a severe impairment, and she ultimately determined that they did not present such limitations. The ALJ further considered Plaintiff's mental health conditions and resulting limitations when assessing his RFC. (R. 14). The ALJ's decision is supported by substantial evidence from the medical record, as discussed above.

Although Plaintiff may have preferred that the ALJ cite to or give more weight to additional evidence, there is no requirement that the ALJ must cite to each piece of evidence when making her decision, and the Court may not reweigh the evidence considered by the ALJ to match the Plaintiff's preferences. *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *Mitchell v. Comm'r. Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.").

Plaintiff also argues that the ALJ's consideration of Plaintiff's daily activities was in error, as "even a highly unstable patient will have good days or possibly good months." (Doc. 20 at 3 (quoting *Simon v. Comm'r of Soc. Sec.*, 7 F.4th. 1094, 1106 (11th Cir. 2021)). Plaintiff's daily activities and caretaking efforts for his mother are both proper for the ALJ to consider, although only one of several factors that the ALJ relied upon in making her decision. *See Dyer*, 395 F.3d at 1212 (reversing district court's reversal of an ALJ's decision where ALJ properly considering claimant's daily activities, symptoms, and medications while concluding that claimant's subjective complaints were inconsistent with his testimony and the medical record). Other evidence relied upon by the ALJ counters Plaintiff's contention that his daily activities and caretaking are a result of a period of lesser symptoms or reduced stress in a home setting, as may be the case in certain mental health cases. The ALJ noted that Plaintiff was not prescribed psychotropic medication, had never been laid off due to inability to get along with others because of his mental health conditions, was able to maintain his finances, and could maintain attention for hours. (R. 14-15). Although other evidence may support a different finding, the evidence relied upon by the ALJ is substantial and goes well beyond Plaintiff's daily activities.

Plaintiff also argues that it was improper for the ALJ to weigh his lack of treatment against him because it was against applicable law and regulations, although Plaintiff does not specify

13

which law and regulations he believes the ALJ's analysis violates. (Doc. 15 at 6). Presumably, because Plaintiff refers to his testimony in raising this argument, Plaintiff means that it was improper for the ALJ to weigh his noncompliance against him because he testified that he has struggled to afford treatment "for a couple of years" because of his lack of insurance and his family and friends have had to help him with copays. (R. 62).

First, it is not clear that the ALJ erred in considering Plaintiff's noncompliance. Much of the evidence in the record shows that Plaintiff failed to comply with medical treatment or consistently take his medications even before his alleged onset date, when he was still employed and receiving health insurance benefits. (*See* R.386, 441, 531, 663). Second, even if the ALJ did improperly consider Plaintiff's noncompliance, that consideration would not warrant remand because Plaintiff's noncompliance was not a principal factor in the ALJ's decision.

Although a claimant's poverty can excuse noncompliance with medical treatment, and ALJs are required to consider whether a claimant's failure to comply with medical care is a result of the claimant's inability to afford the care before denying an application based on a failure to comply, "if the claimant's failure to follow medical treatment is not one of the principal factors in the ALJ's decision, then the ALJ's failure to consider the claimant's ability to pay will not constitute reversible error." *Brown v. Comm'r. of Soc. Sec.*, 425 F. App'x. 813, 817 (11th Cir. 2011) (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003)). The ALJ's decision in this case does not show that Plaintiff's noncompliance was a principal factor in his disability determination, but rather one out of many factors that weighed against a finding of disability. These factors include a variety of medical evidence described in greater detail in the next section, as well as the ALJ's assessment of Plaintiff's limitations, described above. (*See* R. 14-18).

The ALJ's decision shows that she considered all of Plaintiff's medically determinable conditions when establishing Plaintiff's RFC. (*See* R. 14-15). This consideration is reflected in the limitations that the ALJ provided for Plaintiff's RFC, which included a medium work limitation and restrictions on Plaintiff's ability to climb ramps or stairs, balance, stoop, kneel, crouch, crawl, climb ladders, or be exposed to hazards. (R. 15). The ALJ's reasoning reflects that she considered the record as a whole and that her decision is supported by substantial evidence. As discussed in greater detail below, the ALJ's determination that Plaintiff's subjective complaints about the limiting effects of his symptoms were inconsistent with the objective medical evidence in the record is also supported by substantial evidence, and the ALJ's rejection of Plaintiff's subjective complaints in evaluating his RFC was therefore not in error.

   *2. The ALJ's rejection of Plaintiff's testimony is supported by substantial evidence*

Plaintiff argues that the rejection of Plaintiff's allegations regarding his conditions is not supported by substantial evidence. However, the ALJ's decision makes clear that she considered that Plaintiff had mild symptoms of swelling and pain years before his alleged onset date and that Plaintiff's prior seizures had occurred years ago and were potentially related to his alcohol use, in the context of the dates of Plaintiff's last seizure treatment records, Plaintiff's daily activities, Plaintiff's neurological examinations, Plaintiff's improvement with medication and history of discontinuing his medication, among other evidence. (R. 17-18). This record is sufficient to show that substantial evidence supports the ALJ's decision to discount Plaintiff's self-reported symptoms.

This case is not analogous to *Simon v. Comm'r of Soc. Sec.*, 7 F.4th. 1094 (11th Cir. 2021). Plaintiff cites *Simon* to argue that the ALJ's rejection of Plaintiff's allegations as to his symptoms was improper, as the Eleventh Circuit "vacat[ed] the ALJ's finding that the claimant's testimony

15

regarding [the] intensity and persistence of his symptoms and limitations 'are not entirely consistent with the medical evidence and other evidence in the record' [as] improper as the ALJ did not elaborate on which portions of the medical evidence were inconsistent with claimant's testimony." (Doc. 15 at 6). In this case, by contrast, the ALJ did explain which portions of the medical evidence were inconsistent with Plaintiff's testimony where the medical record shows: Plaintiff had mild symptoms of swelling and pain several years before his alleged onset date; most of Plaintiff's documented seizures occurred years before his alleged onset date and were described as potentially related to his alcohol use; there was no evidence of persistent symptoms or treatment related to neuropathy; Plaintiff could perform an array of daily tasks; neurological examinations showed no focal deficits with normal motor function, coordination, and intact speech; the record showed that Plaintiff's seizures stabilized with medication and worsened when he failed to take his medication; there was a lack of evidence regarding the frequency of his seizures in the medical reports; and Plaintiff's treatment tended to be conservative and routine. (R. 17-18). This level of analysis is not analogous to *Simon*, in which the ALJ failed to "identif[y] some specific portion of the record [that] undermin[ed] [the claimant's] credibility." 7 F.4th. at 1110. To the contrary, it shows that the ALJ gave attention to the record as a whole and made findings based on substantial evidence.

Because the record of this case does not show that the ALJ made a reversible error or that the ALJ's findings were not supported by substantial evidence, the Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, this 15th day of September, 2023.

                                                  s/ Charles H. Weigle
                                                  Charles H. Weigle
                                                  United States Magistrate Judge